# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 17, 2013 Session

## STATE OF TENNESSEE v. DANNY RAY SMITH

**Direct Appeal from the Criminal Court for Cumberland County**
**No. 10-0006     Leon C. Burns, Jr., Judge**

---

**No. E2012-02587-CCA-R3-CD-FILED-AUGUST 13, 2014**

---

A Cumberland County Criminal Court Jury convicted the appellant, Danny Ray Smith, of one count of rape of a child, and the trial court sentenced him to twenty-five years to be served at 100%. On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction; (2) the trial court erred by refusing to suppress his statement to police; (3) the trial court erred by allowing evidence of other sexual acts; (4) the trial court erred by allowing the State to introduce into evidence drawings made by the victim before trial; (5) the trial court erred by allowing the State to lead the victim on direct examination; (6) the trial court erred by not forcing the State to give the defense a complete copy of the victim's Department of Children's Services records; and (7) the prosecutors' closing arguments were improper. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's conviction must be reversed because the trial court improperly allowed the State to present evidence of other sexual acts, the trial court improperly allowed the State to introduce into evidence drawings made by the victim, and the prosecutors gave improper closing arguments. Therefore, the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and ROGER A. PAGE, J., joined.

David Brady (on appeal), John B. Nisbet, III (at trial and on appeal), and April Craven (at trial), Cookeville, Tennessee, for the appellant, Danny Ray Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall A. York, District Attorney General; and Gary McKenzie and Amanda Hunter, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

In January 2010, the Cumberland County Grand Jury indicted the appellant for three counts of rape of a child, a Class A felony. Each count alleged that the appellant raped his granddaughter between January 1, 2009, and October 15, 2009. Before trial, the State agreed to a severance of the offenses, and the case proceeded to trial on count 1, which is the subject of this appeal.

At trial, J.B.,[1] the victim's father, testified that he was married to the victim's stepmother and that they lived in Fentress County with the victim and their other children. The victim was born to J.B. and C.S. on September 20, 2001. From January to October 2009, J.B. had sole custody of the victim but allowed her to spend nights with her mother "here and there." On November 1, 2009, J.B. received a telephone call from C.S. J.B. said that based on what she told him, he telephoned his wife, and his wife questioned the victim. J.B. said he left work early and arranged for a meeting at the home of C.S.'s sister, because "we was just putting everything together, because we know this is a serious matter." After the meeting, J.B., his wife, and the victim went to the Fentress County Sheriff's Department and spoke with an investigator. The investigator directed them to the Cumberland County Sheriff's Department (CCSD) because the appellant lived in Fairfield Glade in Cumberland County. J.B., his wife, and the victim arrived at the CCSD about 1:00 a.m. J.B. and his wife met with Investigator Chad Norris while the victim waited in the car. On cross-examination, J.B. testified that he had computers with internet access in his home.

The victim, who was ten years old at the time of trial, testified that she lived with her father and stepmother. In 2009, when she was seven or eight years old, she would visit her biological mother. She said that during the visits, she stayed at her mother's house or "at my pa's," meaning the appellant's house. When the victim spent the night at the appellant's home, she slept with her brothers or in the appellant's bedroom with him and his wife, Mary Ann. However, sometimes Mary Ann would not be there, and the appellant would touch the victim's "private part" under her clothes with his hands and fingers. The victim acknowledged that by "private part," she meant her vagina. She said that the appellant's fingers went inside her vagina, that he also touched the inside of her "bottom" with his hands, and that he touched her with his private part.

The State asked the victim if she remembered being interviewed at the Child Advocacy Center (CAC) and making some drawings there. The victim said yes and

---

[1]In order to protect the victim's identity, we will refer to her family members by their initials.

identified three drawings from the interview for the jury. The first was an anatomical drawing of a girl; the second was an anatomical drawing of a boy; and the third was a drawing made by the victim of her and the appellant. The victim said that on the anatomical drawing of the girl, she circled for the CAC interviewer all of the body parts that the appellant touched. The victim said she circled the drawing's "front private part" and "bottom." On the anatomical drawing of the boy, the victim said she circled the boy's "private part," hand, and mouth. The victim said the third picture showed the appellant's private part touching her private part and "[s]tuff" coming out of his private. She said the "stuff" went onto her private part. The victim said that the appellant touched her private part with his mouth and that his mouth went inside her private part. The victim said that the appellant told her not to tell anyone about the abuse but that she eventually told her mother and stepmother. The appellant touched the victim on more than one occasion.

On cross-examination, the victim acknowledged that she and the prosecutor practiced her testimony and that she told the CAC interviewer that the last incident with the appellant occurred on October 13, 2009. She also acknowledged that when she went to the appellant's house, her mother, her five brothers, and Mary Ann also were there. The victim slept in the appellant's bedroom or on a red couch with her brothers. Sometimes, she got into bed with the appellant; Mary Ann was sleeping in the bed with him. The victim said she did not remember telling the CAC interviewer that her panties were "on the whole time" she was at the appellant's house.

On redirect examination, the victim testified that her panties would be at her knees while the appellant touched her. She acknowledged that on her first drawing at the CAC, she drew a pair of panties around the girl's knees. On recross-examination, defense counsel asked the victim if she knew the difference between the outside and the inside of her body in 2009. The victim answered, "Uh-huh. Sort of."

Investigator Chad Norris of the CCSD testified that toward the end of October 2009, he met with the victim's father and stepmother. As a result of the meeting, the Department of Children's Services (DCS) conducted a forensic interview with the victim. During the interview, Investigator Norris watched from an adjacent room. After the interview, he and Investigator John Haynes went to the appellant's place of employment and told him that they needed to speak with him about his granddaughter. The appellant went to the sheriff's department, and Investigators Norris and Haynes interviewed him. Investigator Norris said that he gave <u>Miranda</u> warnings to the appellant before the interview and that the appellant appeared to understand the warnings.

Investigator Norris testified that the appellant waived his rights and gave a statement, which Investigator Haynes wrote for the appellant. Investigator Haynes read the statement

-3-

back to the appellant, sentence by sentence, and gave the appellant an opportunity to make corrections. The appellant signed the statement, and Investigator Norris read the statement to the jury as follows:

> Sometime over a month ago, [the victim] was in bed with me. I rubbed her vagina, and she rubbed my penis. About two months ago, [the victim] was in bed with me and I was rubbing her vagina and stuck just the tip of my little finger in her vagina. That same night, I was kissing her vagina and stuck just the tip of my tongue in her vagina. On another night, [the victim] was in bed with me, she was naked, and my shorts were down. We were rubbing on each other. I ejaculated on her abdomen. Anything that has happened has been within the last six months.

At Investigator Norris's request, the appellant traced his hand on a piece of paper during the interview. Investigator Norris instructed the appellant to mark which finger he put inside the victim and mark how far his finger went inside the victim. The appellant marked the tip of his pinky finger. Investigator Norris acknowledged that he used police interview techniques during the appellant's interview and that he did not record the interview.

On cross-examination, Investigator Norris identified a 2009 school calendar for Fentress County and acknowledged that, according to the calendar, students were on fall break from Monday, October 12, to Friday, October 16, 2009. He said he did not remember whether he asked the appellant if the appellant could read or write. He acknowledged that during the victim's CAC interview, the victim did not verbally respond to many of the interviewer's questions and that the victim "did a lot of drawing."

Investigator John Haynes of the CCSD testified that on November 10, 2009, he and Investigator Norris interviewed the appellant. Investigator Haynes wrote the appellant's statement. After each sentence, Investigator Haynes read the entire statement back to him "to make sure that [it was] understood and that it [was] correct." If the appellant had told Investigator Haynes that a sentence was incorrect, Investigator Haynes would not have continued. Investigator Haynes acknowledged that during the interview, he used tactics he had learned through his training and experience.

On cross-examination, Investigator Haynes testified that children the victim's age "probably should not know as much as she could tell us -- unless she lived it." However, he acknowledged that children could get information about sex from internet pornography and older siblings. Investigator Haynes also acknowledged that he used his own words to write the appellant's statement and that he did not write down everything the appellant said. He

-4-

stated, though, that the appellant agreed to the statement line by line. Investigator Haynes said he did not remember if the appellant ever denied the allegations. At the conclusion of Investigator Haynes's testimony, the State rested its case and elected that the offense involved the appellant's digitally penetrating the victim's vagina.

Terry Taylor testified for the appellant that he was C.S.'s fiancé and that the appellant was C.S.'s father. On October 9, 2009, Taylor, C.S., C.S.'s mother, the victim, and some of the victim's brothers attended an Aaron Tippin concert. The following week, the victim stayed with Taylor and C.S. at the home of C.S.'s mother. On October 13, 2009, the victim did not have any contact with the appellant.

The victim's then sixteen-year-old brother testified that in October 2009, he mostly lived with the appellant at the appellant's trailer. He slept on a red couch, and, sometimes, the victim and their older brother spent the night. He never heard the victim say anything about the appellant's molesting her. He said the victim did not stay at the appellant's trailer very often because she liked to spend time with their mother. If the victim was at the trailer, their mother was usually with her. However, the victim stayed at the trailer without their mother "[a] couple of different times." He said that when the victim spent the night at the trailer, she usually slept on a second couch or in a chair. He said the victim would go into the appellant's bedroom often because "the bathroom [was] on the other side of his room." The victim also watched television in the bedroom. In October 2009, he attended an Aaron Tippin concert with some of his brothers, C.S., Terry Taylor, C.S.'s mother, and the victim.

The appellant testified that he was fifty-eight years old and completed the second grade. He said that he could not read or write, that he could barely write his name, and that he had worked at a handle mill in Crossville for thirty years. Regarding the victim's allegations, he said that "it never happened." He said that he loved the victim, that he would never hurt her, and that he did not know why she had made the allegations against him.

The appellant acknowledged giving a statement to Investigators Norris and Haynes and testified as follows:

> I'd been up all night. I work hard. I worked hard all day. I went in this little bitty room. The first thing they did when I went through the door was, they told me I might as well tell the truth, they knowed I was guilty. And every time that they'd ask me a question, and I'd tell them, no, it didn't happen, they'd say, "You're lying. We want to question." And directly got me so upset that I just agreed to whatever he said. He -- he -- he wrote the thing out. He's the one that said I did all of this stuff; he's

the one that got me to agree to it. And, you know, me, being upset, and I can't understand a lot, anyway, and that's basically what happened. They just railroaded me right into it.

The appellant said that one of the investigators told him that he would not go to jail if he agreed to the statement and that he signed it because he was "wanting to get out of there." He acknowledged that one of the investigators read the statement to him. However, he said, "I didn't really understand what he was getting me for. I -- never stuck nothing in no kid, never. I would never hurt a kid." The appellant acknowledged that he watched the victim's recorded CAC interview and said that "the little girl probably was messed with, but not by me."

The appellant testified that the victim came to his house occasionally. However, the appellant worked all the time, and the victim usually was gone by the time he got home. He said that if the victim came into his bedroom to watch television, he went into the front room or went outside and that his wife, Mary Ann, was always there. Between January 1 and mid-October 2009, the appellant may have seen the victim three times.

On cross-examination, the appellant acknowledged that he had a prior felony conviction for filing a false report and two prior felony convictions for driving under the influence (DUI). He said that he violated probation and spent time in prison. He said that one of the investigators repeatedly called him a liar when he denied the victim's allegations and that he was not thinking when he confessed. He said that the investigators did not yell at him but that one of them told him, "'I know you've done this. You might as well own up to it all.'" He said that Investigator Haynes "read me what he wanted me to hear" and that "I may not be innocent of a lot of things, but I'm innocent of this right here."

At the conclusion of the appellant's testimony, the defense rested its case, and the jury convicted him of rape of a child as charged in count 1. After a sentencing hearing, the trial court sentenced him to twenty-five years to be served at 100%.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the conviction. Although the appellant does not explain how the evidence is insufficient, the State "presumes that the [appellant's] challenge is a general one that the record contains no proof from which a reasonable juror could conclude that the [appellant] committed this offense." The State argues that the evidence is sufficient. We agree with the State.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012); see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See Wagner, 382 S.W.3d at 297; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. See Wagner, 382 S.W.3d at 297; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. See Wagner, 382 S.W.3d at 297; Cabbage, 571 S.W.2d at 835. A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of both. "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Taken in the light most favorable to the State, the evidence shows that sometime between January 1 and October 10, 2009, the appellant digitally penetrated the victim's vagina. The victim testified at trial that the appellant digitally penetrated her while she was spending the night at his home, and the appellant gave a statement to police in which he said that he put the tip of his pinky finger inside the victim. He also marked on a tracing of his hand how far his pinky finger went inside her. Although the appellant testified at trial that he lied in his statement and that the investigators coerced him into confessing, the jury obviously resolved the issues of credibility in the State's favor. The credibility of the witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). Therefore, we conclude that the evidence is sufficient to support the conviction.

-7-

B. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress his confession because he was illiterate and, therefore, could not knowingly and voluntarily waive his Miranda rights. The State argues that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his confession, arguing that his statement was the result of duress and coercion and that the investigators took advantage of his diminished mental state and inability to read or write. At the suppression hearing, Investigator Norris testified for the State that before the appellant's interview, he read a Miranda rights form to the appellant and explained each right to him. Investigator Norris said that the appellant did not hesitate to sign the form and that the appellant "advised that he understood his rights." After the appellant waived his rights, Investigator Norris filled out a two-page biographical worksheet for the appellant by asking him questions about his name, address, telephone number, educational background, employment history, and criminal history. The appellant told Investigator Norris that he had an eighth-grade education and that he had worked at a handle mill for more than forty years. The appellant also told the investigator that he had been convicted of DUI and that his driver's license had been suspended for five years. Investigator Norris identified forms signed by the appellant, showing that the appellant had pled guilty to DUI, fourth offense; filing a false report; and DUI, fifth offense.

Investigator Norris testified that after he filled out the appellant's biographical worksheet, he talked with the appellant about the victim's allegations. At the conclusion of their conversation, Investigator Haynes wrote the appellant's statement. Investigator Haynes read the statement back to the appellant, and the appellant signed it twice. Investigator Norris said the appellant "stated that he understood, and that . . . these were his statements as to what the allegations were and what he did." As part of the statement, the appellant placed his hand on a sheet of paper, and Investigator Haynes traced the appellant's hand with a pen. The appellant drew a line on one of the tracing's fingers, showing how far the finger penetrated the victim. Investigator Norris identified two deeds of trust initialed and signed by "Danny R. Smith" and C.S.'s mother. Investigator Norris acknowledged that the "Danny R. Smith" signatures on the deeds of trust looked similar to the appellant's signature.

On cross-examination, Investigator Norris testified that he did not audio- or video-record the appellant's interview. He said he was relying on his memory of the interview and that it was the sheriff's department's policy not to record interviews. He said that after he read Miranda warnings to a suspect, he "reiterate[d] each one." The appellant's interview lasted one hour and five minutes. Investigator Norris acknowledged that "[v]ery few" people

read mortgage documents before they signed them.

Investigator Haynes testified that he witnessed the reading and signing of the appellant's waiver of rights form. He said that he and Investigator Norris were very meticulous about making certain that a suspect had a clear understanding of what was going on and that they always read and went over each sentence on the form with the suspect. Investigator Haynes wrote the appellant's statement for him. After each sentence, Investigator Haynes asked the appellant if the sentence was correct. Investigator Haynes said he would not have gone to the next sentence if the appellant had not agreed to the previous sentence. The appellant signed the statement twice, once time to attest that the statement was his statement and once to show the end of the statement. The appellant was able to converse with the investigators and never indicated that he did not understand what he was doing. Investigator Haynes said that he and Investigator Norris traced the appellant's hand on a piece of paper and that appellant "put a line across the end of the little finger indicating about a half an inch." The appellant signed the tracing.

On cross-examination, Investigator Haynes testified that he did not remember taking notes during the appellant's interview. He also said he did not remember if he handed the waiver of rights form to the appellant and told the appellant to read it.

C.S., the appellant's daughter and the victim's mother, testified for the appellant that he could not read or write but could sign his name. She stated that "ever since I could read, I've had to go over all of his papers for him and fill them out. He would just sign them, and I'd have to explain to him what it was." She said that the appellant "didn't get very far in school" and that he had worked at a handle mill and some dairy farms most of his life. She said she had never seen him read a newspaper, magazine, or book.

On cross-examination, C.S. acknowledged that the appellant had maintained employment at the handle mill for most of her life and that he had owned property. She said, though, that the appellant and her mother "ended up losing the property because they didn't understand . . . all the mortgages and everything else was going to be attached to it." She said that her mother was the one who entered into the contract but that the appellant signed it. She said that the appellant functioned on a second- or third-grade level and that she had to "break it down" for him in order for him to understand things.

The trial court held that although the proof showed that the appellant could not read or write, "that doesn't make him unable to understand what is happening in the world." The trial court noted that although it would have been "nice" if the investigators had recorded the appellant's interview, the law did not require a recording. The trial court accredited the officers' testimony that they reviewed the appellant's Miranda rights with him and that he

-9-

understood his rights. The trial court held that the appellant knowingly and voluntarily waived his rights and that he gave his statement under no duress or coercion. The court denied the appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The appellant contends that the trial court should have granted his motion to suppress his confession because he is illiterate and did not knowingly and intelligently waive his rights against self-incrimination. Generally, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Further, to determine the admissibility of a confession, "the particular circumstances of each case must be examined as a whole." Id. If, prior to making a statement, the police inform the accused of his Miranda rights and the accused proceeds to knowingly and voluntarily waive those rights, the statement is then admissible against the accused due to the valid waiver of the privilege against self-incrimination. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998) (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)).

Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). As this court has stated,

Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was "such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined." The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (citations omitted). Moreover,

despite testimony of the appellant's illiteracy, mental disability, and educational background[,] these factors do not, in and of themselves, render the appellant's statement involuntary. See State v. Perry, 13 S.W.3d 724, 738 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1999) (citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985); State v. Greer, 749 S.W.2d 484, 485 (Tenn.. Crim. App. 1988); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances.

State v. John Philip Noland, No. E2000-00323-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 608, at *6 (Knoxville, Aug. 3, 2000).

The evidence at the suppression hearing established that Investigator Norris read Miranda warnings to the appellant and explained the warnings to him. Although the appellant, who was fifty-five years old when he gave his statement, had only a grade-school education and could not read or write, the appellant never indicated to the officer that he did not understand his rights. Furthermore, the appellant had prior experience with the police, having pled guilty to DUIs and filing a false report. Nothing indicates that the appellant was detained prior to giving his statement, that he was intoxicated or in ill health at the time of his statement, or that he was subjected to physical abuse or threats of abuse by the officers. After the appellant gave his statement, Investigator Haynes wrote it for him and read it back to him line by line, verifying the accuracy of each sentence. We note that the appellant did not testify at the suppression hearing regarding his lack of understanding his rights or the investigators' alleged coercive activity. In sum, based on the totality of the circumstances, we conclude that the trial court did not err by finding that the appellant gave his statement knowingly and voluntarily.

C.  Other Sexual Acts

The appellant contends that the trial court erred by allowing the State, pursuant to State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), to present evidence of other sexual acts that allegedly occurred between him and the victim.  He also contends that the trial court failed to comply with Tennessee Rule of Evidence 404(b) by refusing to conduct a requested 404(b) hearing and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403.  The State argues that the trial court properly admitted proof of other sexual acts pursuant to Rickman.  We conclude that the State and the trial court incorrectly relied on the Rickman exception to admit evidence of the appellant's other sexual acts with the victim.  Additionally, after careful consideration of the evidence and the circumstances of this case, we cannot conclude that the error was harmless.

The State originally charged the appellant with three counts of rape of a child.  Before trial, the appellant filed a motion in limine to prohibit the State from mentioning or alluding to any prior convictions or other bad acts, particularly sexual acts perpetrated by the appellant against the victim until a hearing could be conducted pursuant to Tennessee Rule of Evidence 404(b).  He also filed a motion for a bill of particulars and a motion to sever the offenses.  The State filed a written response to the motion for a bill of particulars, asserting that the trial court should deny the motion because the appellant was aware of the allegations due to his confession.  The State also asserted that it could not limit the time frame alleged in the indictment for counts 1 and 2 but that it could limit the time frame for count 3 to "on or between October 1, 2009 to October 15, 2009."

During a pretrial hearing on the motions, defense counsel argued that the trial court should grant the motion to sever pursuant to State v. Garrett, 331 S.W.3d 392 (Tenn. 2011), which had recently been filed by our supreme court.  Initially, the State opposed the motion.  However, the State later conceded that severance was warranted pursuant to Garrett and announced that it was proceeding to trial on count 1.  The trial court asked the State, "And then you are relying upon Rickman, the case of State v John Rickman, to allow incidents of sex crimes in the time frame of the indictment.  Is that correct?"  The State answered, "That's correct."  The appellant objected, arguing that such evidence was inadmissible pursuant to Tennessee Rule of Evidence 404(b) and that the trial court should require the State to limit its evidence to "one set of proof, one event" that occurred within the time frame alleged.  The trial court overruled counsel's objection, holding that "the Rickman case controls." Regarding the appellant's motion for a bill of particulars, the trial court denied the motion, stating, "I can't force them to give you something they don't have, and so it will just have to develop in the proof and see what -- what it is.  I assume you've got some way to distinguish one incident from another incident."

On the morning of the first day of trial, defense counsel renewed his motion in limine to exclude evidence of other sexual acts, maintaining that the trial court should limit the State's proof to evidence constituting only one rape of a child. Defense counsel also argued that any evidence that constituted a sexual crime other than rape of a child was inadmissible. The State responded as follows:

> We have an open-ended indictment. We have a child that will testify, and she cannot say that this happened on October 3rd, January 1. She can say, "This is what happened to me over this course of time." She's going to talk about things that the defendant confessed to doing. She is going to -- it's going to be very difficult for her, as we tried to narrow it down, to say, "On this day, he came in, and this specifically happened, and then I went to school the next day." That's not what we're dealing with. This is a Rickman situation. We have tailored her testimony as best we can to get her to concentrate on the elements of the offense, and to -- to not -- we're not going to go deep into every single time that they've ever had contact. But, certainly, we are allowed to do that under the current state of law in Tennessee.

The State then distinguished the instant case from State v. Jeff Carter, No. M2009-02399-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 1074 (Nashville, Dec. 16, 2010), and stated as follows:

> We don't have a date specific. We don't have anything to really distinguish [count 1], to say, "This time was vaseline, this time . . ." you know, we don't have that [as in Jeff Carter].
>
> . . . .
>
> But we have talked to her, and we have worked with her. We anticipate that she is going to say, "I would stay the night with my grandfather over the course of this time period, and there were nights he came in, and he rubbed my chest, and he took his finger and rubbed my privates, and put his finger inside my private, and there was -- he also would put his finger inside my bottom." And so that's what we anticipate she's going to testify to. And the confession is exactly what -- and she disclosed that back before the confession. She disclosed that to the CAC. And

-13-

that's what we're going to focus on.

. . . .

[W]e anticipate, at the close of proof, that we are going to try to elect an event that she was penetrated on, and that she will describe different -- you know, one in the bottom, and one in the vaginal area, and we anticipate electing the vaginal area, because the defendant's confession, he draws his hand and says, "I stuck my finger inside her vagina." So, we are hoping to elect that event. Now, I don't know what's going to happen when she gets on that witness stand and she looks at that jury. And if she clams up and only says that he touched her in the bottom, you know, and penetrated her in the bottom, obviously, that may be what we elect. But we are anticipating to elect that offense if that's what she testifies to.

The trial court overruled the appellant's renewed motion in limine. The appellant appeals that ruling, arguing that evidence of other sexual acts introduced through the victim's testimony and his confession was inadmissible.

Pursuant to Rule 404(b), Tennessee Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). For example, evidence of other crimes may be admissible to show identity, motive, intent, guilty knowledge, absence of mistake or accident, or a common scheme or plan. See State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.6 (3d ed. 1995)).

In Rickman, our supreme court explicitly declined to recognize a general "sex crimes" exception to Rule 404(b) that would have allowed evidence of other sexual offenses to be admitted at trial. 876 S.W.2d at 828-29. However, the court created a narrow "special rule admitting evidence of other sexual crimes when an indictment charges a number of sexual offenses, but alleges no specific date upon which they occurred." Id. at 828. According to Rickman, when an indictment charges that a number of sexual offenses occurred over a span of time, the State can introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that time span. Id. at 828-29. At the conclusion of its case-in-chief, though, the State must elect the particular incident for which

-14-

a conviction is being sought. Id. at 829. This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors deliberate over and return a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1991).

In Jeff Carter, the defendant was charged with one count of rape of a child "occurring 'on or about' May or June 1996." No. M2009-02399-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 1074, at *3. In response to a motion for a bill of particulars filed by the defendant, the State described an incident in which the defendant had applied Vaseline to the victim's vagina and put his penis between her legs. Id. at **21-22. During a pretrial motions hearing, the State argued that in addition to the "'Vaseline incident,'" the victim also should be allowed to testify under Rickman that the defendant digitally penetrated her numerous times. Id. at **22-23. The trial court agreed with the State, concluding that Rickman allowed the victim to testify about other sexual acts that occurred during the time frame specified in the indictment. Id. at **26-27. However, this court ruled that the trial court committed reversible error by allowing testimony of bad acts outside the bill of particulars, explaining that

> in justifying the Rickman exception, our supreme court stated that the State should be allowed "some latitude" because young victims "are frequently unable to identify a specific date on which a particular offense was committed." Rickman, 876 S.W.2d at 828. Although there was an issue regarding the time frame of this incident, the scenario presented in this case is distinguishable from one of the stated purposes of the Rickman exception. This was not a scenario in which a child victim alleged she had been abused, provided a vague description of events, and the State had to wait and see what the child testified to in front of the jury in order to properly align its case with the indictment. In this case, the indictment was specifically based upon the Vaseline incident. The prosecutor even acknowledged that fact during his motion argument, stating, "I believe that the Court should allow the State to introduce evidence within the timeframe of the indictment, which of course is the Vaseline episode." (emphasis added) Here, the State chose to use the Rickman exception as a tactic to allow the jury to hear that the Defendant had also digitally penetrated the victim, not because it needed "some latitude" dealing with a young victim unable to

-15-

identify a specific date.

Id. at **28-29.

As demonstrated by Jeff Carter, the Rickman exception does not apply simply because an indictment alleges that unlawful sexual contact occurred between a defendant and a victim over a span of time. Instead, the State must also show that the young victim can provide only a vague description of events and that the State must take a "wait and see" approach to the victim's testimony in order for it to show that the defendant committed the offense or offenses alleged in the indictment. When, however, a defendant is on trial for one offense, the State can pinpoint a specific event that occurred during the time frame alleged in the indictment, and the victim can testify to that event, the Rickman exception does not apply.

Turning to the instant case, the record reflects that the State had "worked with" the victim and was well-aware pretrial that it planned to elect the appellant's penetrating the victim's vagina with his pinky finger as the event for which it was seeking conviction. That anticipated election was based not only on the victim's expected testimony but on the appellant's confession about his having penetrated the victim with his pinky finger and the inculpatory tracing of his hand on which he marked how far he inserted his finger into the victim. In our view, as in Jeff Carter, the State chose to use the Rickman exception as a tactic to allow the jury to hear that the appellant had committed numerous other sexual acts against the victim. Therefore, we conclude that the trial court erred by allowing the State to present evidence of those other sexual acts.

Next, we must determine the effect of the error. The error at issue is a non-constitutional error. Id. at **38-39. Accordingly, the defendant has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). As our supreme court has explained,

> In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" Spicer, 12 S.W.3d at 447 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" Toliver, 117 S.W.3d at 231 (quoting State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not

simply on the weight of the evidence, but on "the actual basis
for the jury's verdict." Rodriguez, 254 S.W.3d at 372.

Garrett, 331 S.W.3d at 405.

The victim properly testified about the appellant's digital penetration of her vagina but improperly testified about other sexual acts involving additional penetration and touching. Likewise, the appellant's statement to the investigators should have been redacted to exclude acts other than his penetrating the victim's vagina with his pinky finger. The appellant denied at trial having had any sexual contact with the victim and claimed that the investigators coerced him into confessing to the victim's allegations. The evidence at the trial and suppression hearing established that the appellant could not read or write and that Investigator Haynes did not use the appellant's own words to write the statement. During oral arguments, counsel for the appellant noted that the confession included words that would have been unfamiliar to a person of the appellant's educational background.

Furthermore, during the State's closing arguments, it repeatedly referred to the appellant's other sexual acts with the victim. Defense counsel objected, arguing that the State had elected one offense but was "talking about everything else that's happened." The trial court instructed the State, "Focus on the event that your charging him with." Nevertheless, the State continued, over defense counsel's continued objection, to refer to the appellant's other sexual acts and re-read the appellant's entire confession to the jury. We note that during the jury charge, the trial court instructed the jury to consider only the elected act of digital penetration in deciding the appellant's guilt. "It is presumed that the jury followed the trial judge's instruction[] not to consider inadmissible evidence." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). However, considering the highly prejudicial nature of the improperly admitted evidence and the additional errors that will be discussed below, we cannot say that the trial court's error was harmless. Therefore, the appellant's conviction must be reversed and the case is remanded to the trial court for a new trial.

Regarding the appellant's claim that the trial court failed to comply with Tennessee Rule of Evidence 404(b) by refusing to conduct a 404(b) hearing, our review of the pretrial transcript reveals that the State conceded that the evidence was not admissible "for other purposes" under Rule 404(b). Therefore, the trial court, relying on the State's concession, did not err by failing to conduct a 404(b) hearing. Regarding the appellant's claim that the trial court should have excluded evidence of his other sexual acts pursuant to Tennessee Rule of Evidence 403, Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. However, inherent in Rickman is that evidence properly admitted pursuant to the Rickman exception will not be

-17-

inadmissible under Rule 403.  In any event, we have already determined that the appellant is entitled to a new trial because the evidence was inadmissible pursuant to Rickman.

## D.  Drawings

The appellant claims that the trial court erred by allowing the State to introduce into evidence the drawings made by the victim during her CAC interview.  He contends that the drawings were hearsay and violated his right to confrontation.  The State argues that the drawings, while hearsay, were admissible under Tennessee Rule of Evidence 803(4), the exception for hearsay statements made for purposes of medical diagnosis and treatment, and that the drawings did not violate the appellant's right to confrontation. We conclude that the drawings were inadmissible hearsay but did not violate the appellant's right to confrontation.

Before trial, the appellant filed a motion in limine to exclude seven drawings made by the victim during her interview at the CAC.  In a pretrial hearing, defense counsel argued that the drawings violated the appellant's right to confrontation because the appellant did not have an opportunity to cross-examine the victim about the drawings when she made them. Defense counsel also argued that the drawings were hearsay and "double hearsay" because they were made by the victim and her interviewer.  The State advised the trial court that it did not intend to question the victim about four of the drawings but that she would testify about three of them.  The State explained, "This little girl has a difficult time saying what happened to her, and she relied on these drawings, and will rely on these drawing in the courtroom today to indicate where it was that she was touched."  The trial court ruled that because the victim was going to testify at trial, the drawings were admissible.

On direct examination, the victim testified that the appellant touched her private part under her clothes.  She also testified that he put his fingers inside her vagina and that he touched her bottom with his hands.  At that point, the State showed the three drawings to the victim and questioned her about them.  The State introduced the drawings into evidence during the victim's redirect examination testimony.

Generally, the admissibility of evidence lies within the sound discretion of the trial court.  State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000).  The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence.  See State v. Young, 196 S.W.3d 85, 105 (Tenn. 2006).  An appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse.  See State v. Turner, 352 S.W.3d 425, 428 (Tenn. 2011).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. Rule 803(4), Tennessee Rules of Evidence, provides an exception to the hearsay rule for "[statements] made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The State acknowledges that the drawings were hearsay. See State v. Robert Fann, Jr., No. M2011-00241-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 542, at **34-35 (Nashville, July 12, 2012). Although the State claims on appeal that the drawings were admissible pursuant to Tennessee Rule of Evidence 803(4), the State did not argue at trial that the drawings were admissible pursuant to any exception to the hearsay rule. "Ordinarily, issues raised for the first time on appeal are waived." State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Regardless, the State has presented no evidence that the drawings were made for the purpose of medical diagnosis or treatment. Therefore, we agree with the appellant that the drawings were inadmissible hearsay and that the trial court erred by overruling the appellant's objection to them. Furthermore, in light of the error addressed in the previous section, we cannot say that the trial court's error was harmless.

As to the appellant's claim that the drawings violated his right to confrontation, we disagree with the appellant. In Crawford v. Washington, 541 U.S. 34 (2004), the United States Supreme Court analyzed the Sixth Amendment right to confrontation and drew a distinction between the admission of testimonial and nontestimonial hearsay. The Court explained that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny; however, the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. Crawford, 541 U.S. at 68. "[T]he Confrontation Clause 'does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.'" State v. Banks, 271 S.W.3d 90, 118 (Tenn. 2008) (quoting Crawford, 541 U.S. at 59). The victim testified at trial and was subject to thorough cross-examination by the appellant. Therefore, her testimony about the drawings did not violate the appellant's right to confrontation.

### E. Leading

Next, the appellant claims that the trial court erred by allowing the State to lead the victim during her testimony. The State argues that the appellant is not entitled to relief on this issue. We agree with the State.

Defense counsel objected five times to the State's leading the victim during her direct

examination testimony. The trial court ordered the State to rephrase its questions in response to three of the objections and sustained the final objection. The trial court only overruled the first objection, which defense counsel made when the State asked the victim, "And did you stay more than -- more than once [at Pa's house]?" However, a trial court can allow leading questions of child sex offense victims on direct examination when necessary to fully develop the witness's testimony. Tenn. R. Evid. 611(c)(1). Therefore, we conclude that the appellant is not entitled to relief.

## F. DCS Records

The appellant contends that the trial court erred by not forcing the State to provide defense counsel with a complete copy of the victim's DCS records. The State argues that the appellant is not entitled to relief on this issue. We agree with the State.

Before trial, the appellant filed a motion to compel discovery of "[a]ny and all records including but not limited to audio and video taped interviews conducted by the Department of Children's Services (DCS) of [the victim] (DOB: 09/21/01)." In a pretrial hearing on October 12, 2011, defense counsel argued that he was entitled to the records based on the district attorney general's open file policy and because the records "could lead to exculpatory evidence." The State advised the trial court that it did not have the victim's DCS records because it had never requested them. The State informed the trial court that defense counsel wanted the records "to establish an inconsistency in the victim's statements" and argued that the records were not material to the appellant's case and were not subject to discovery. The trial court ruled that the appellant was not entitled to the records but that, if defense counsel subpoenaed them, the trial court would review the records in camera and "then . . . we'll look at it and see what has to be done." Defense counsel advised the court that he would file a subpoena for the records that afternoon, and the court instructed defense counsel to have the records sent to the court's office.

A subpoena duces tecum for the records was issued to DCS. In response, counsel for DCS filed a motion to quash or, in the alternative, a motion for a protective order. As noted in the State's brief, the record does not reflect whether the trial court ever ruled on DCS's motion. However, the record reflects that DCS delivered the records to the trial court.

During a pretrial hearing on November 4, 2011, defense counsel requested a continuance "to review the DCS files that I had subpoenaed." Counsel advised the trial court that "because I got documents Friday, October 28th, it will be difficult for me to get ready for trial with the expected trial date being November 17th[.]" The trial court reviewed its calendar, noted defense counsel's upcoming trial dates, and denied the motion. However, the trial court advised defense counsel that "obviously, it can be renewed again." Defense

counsel did not renew the motion.[2]

At the appellant's motion for new trial hearing, defense counsel testified as follows regarding what happened next with the records:

> I went up and looked at them. It was my understanding that I couldn't have a copy of the complete file, but I could copy -- I could have Ms. -- Judge Burns' secretary to copy whatever documents I needed, wanted out of the file.
>
> . . . .
>
> I know it wasn't the complete record.
>
> . . . .
>
> [T]he biggest issue was, I couldn't talk to Mr. Smith about it. Mr. Smith was incarcerated, and I couldn't go over it with him, the Department of Children Services' records, because I didn't have them in hand to go over them.
>
> . . . .
>
> [A]s the case evovle[d], I wasn't sure what -- what was in the file. I mean, I had to rely on what my memory was of it. And, like I said, I did the best of copying what I thought was relevant, but I just didn't have the whole file, and so your [sic] not sure what you've got.

On cross-examination, defense counsel clarified that he did not know if DCS turned over the complete file to the trial court. He stated that he "subpoenaed all the records involving the victim" and that he "had to work on the assumption that that was . . . the whole file." The State asked defense counsel if he knew of any document in the file that would have changed the outcome of trial, and he answered, "No."

The appellant contends that he is entitled to a new trial because the DCS records were

---

[2]Although counsel did not renew the motion, the appellant's trial did not begin until February 14, 2012.

crucial to developing his defense and that "without a copy of the complete DCS file, in hand, it was impossible for counsel to 'discuss fully potential strategies and tactical choices with his client.'" However, defense counsel testified at the motion for new trial hearing that he had access to the file and that he received copies of any documents he wanted. Moreover, defense counsel testified that he assumed the file was complete and that he did not know of any documents in the file that would have changed the outcome of trial. We note that the appellant has not alleged on appeal that any documents would have changed the outcome of this case. Therefore, we conclude that the appellant is not entitled to relief.

## G. Prosecutor's Closing Arguments

Finally, the appellant contends that the trial court erred by allowing the State's prosecutors to vouch for and bolster the testimony of the State's witnesses, use "inflammatory rhetoric," argue facts outside the scope of the State's elected offense, and belittle defense counsel and his trial strategy during their closing arguments. The State argues that the appellant has waived most of his claims because he failed to make contemporaneous objections. For those claims in which defense counsel lodged contemporaneous objections, the State argues that the appellant has failed to demonstrate reversible error. We conclude that the State's repeated references to the appellant's other sexual acts and its use of personal examples to bolster the victim's credibility constitute reversible error.

It is well-established that closing argument is an important tool for both parties during a trial and, therefore, that counsel is generally given wide latitude during closing argument. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record[; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

In his brief, the appellant cites to numerous examples that he claims were improper closing arguments by the State's prosecutors. However, the appellant objected to only two of the prosecutors' arguments. We agree with the State that the appellant has waived any claim for which he did not lodge a contemporaneous objection. See Tenn. R. App. P. 36(a).

The appellant's first objection occurred during the State's initial closing argument when one of the prosecutors stated as follows:

> But [the victim] told, and she told you, as difficult as it was, what happened to her. She told you that when she was over at her grandpa's, she was in bed with the man that's supposed to take care of her, and her panties would be around her knees, and his finger would be inside her vagina, inside of her bottom, and his tongue would be inside of her, and that he would ejaculate onto her body.

At that point, defense counsel objected, and the trial court instructed the prosecutor to "contain your argument to what the proof was. The jury will decide whether that would be part of the proof or not. . . . Focus on the event that you're charging him with." Shortly thereafter, the prosecutor stated,

> [A]fter just really a short amount of time, he gives them a statement. And you'll get this, and you'll be able to take this

-23-

back.

> The statement: "Sometime over a month ago, [the victim] was in bed with me. I rubbed her vagina, and she rubbed my penis. About two months ago, [the victim] was in bed with me, and I was rubbing her vagina and stuck just the tip of my little finger in her vagina. That same night, I was kissing her vagina . . ."

Defense counsel interrupted the prosecutor and stated, "Judge, once again, we're beyond the scope of what their election is." The prosecutor advised the trial court that the appellant's statement had been introduced into evidence, and the trial court overruled the objection. The prosecutor continued reading the appellant's confession to the jury.

We agree with the appellant that the prosecutor's references to the appellant's other sexual acts when the State had elected digital penetration as the single event for which it was seeking conviction was improper. Moreover, we are troubled that the prosecutor continued to argue the sexual acts to the jury when the trial court had instructed her to "[f]ocus on the event that you're charging him with." Given our previous conclusion that the trial court improperly admitted the other bad act evidence under Rickman, we cannot say that the prosecutor's improper closing argument was harmless.

Defense counsel also objected when the second prosecutor stated as follows during his rebuttal closing argument:

> Let me tell you something. I remember taking my daughter, my two daughters at the time, to Disney World. And we went on that trip, and that's been several years ago. And I can't tell you the clothes I had on, and I can't tell you what she was wearing. I can't really remember what the temperature was that night. But I will never forget the look -- -

Defense counsel interrupted and objected. The trial court overruled the objection, stating, "He may argue." The prosecutor continued as follows:

> I will never forget the look on her face when the fireworks went off. And don't tell me it didn't happen because I can't remember the specific date, and don't tell me that it didn't happen because I cannot remember the clothes or the shoes that I wore. That will forever be burned in my brain.

We agree with the appellant that the prosecutor improperly used personal examples as a way to vouch for the victim's credibility.  See State v. Emoe Zakiaya Mosi Bakari, No. M2010-01819-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 98, at **32-36 (Nashville, Feb. 15, 2012).  Moreover, in light of the other errors in this case, we cannot say that the prosecutor's improper argument was harmless.

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court improperly allowed the State to present evidence of other sexual acts, that the trial court improperly allowed the State to introduce into evidence drawings made by the victim, and that the prosecutors gave improper closing arguments.  We also conclude that the errors warrant reversal of the appellant's conviction.  Therefore, his conviction for rape of a child is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE